## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**KEVIN L. STURGEON,**

      **Plaintiff,**

    **vs.**                               **Civ. No. 15-342  KK**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

      **Defendant.**


## MEMORANDUM OPINION AND ORDER[1]

    **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 16) filed July 30, 2015 in support of Plaintiff Kevin L. Sturgeon's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title II disability insurance benefits and for Title XVI supplemental security income benefits.  On October 16, 2015, Plaintiff filed his Motion to Reverse and Remand for Rehearing, With Supporting Memorandum ("Motion").  (Doc. 21.)  The Commissioner filed a Response in opposition on January 14, 2016 (Doc. 25), and Plaintiff filed a Reply on January 25, 2016.  (Doc. 26.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is not well taken and is **DENIED.**

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 3, 8, 12.)

# I.  Background and Procedural Record

Claimant Kevin Sturgeon ("Mr. Sturgeon") alleges that he became disabled on August 1, 2009, at the age of fifty-four because of back pain, knee pain, leg problems, chronic obstructive pulmonary disease, emphysema, and anxiety.  (Tr. 176, 205, 219.[2])  Mr. Sturgeon completed his GED in 1972, (Tr. 220), and worked as a carpenter, window glazier, operations manager, semi driver, maintenance man, fastener salesman, and package delivery man.  (Tr. 207, 234.)

On March 12, 2013, Mr. Sturgeon protectively filed[3] applications for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 et seq. and for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq.  (Tr. 176-85, 186-87, 205.)   Mr. Sturgeon's applications were initially denied on July 10, 2013.   (Tr. 76, 77-86, 87, 88-97, 124-27, 128-30.)   Mr. Sturgeon's applications were denied again at reconsideration on August 20, 2013.  (Tr. 98, 99-109, 110, 111-121, 134-37.)   On September 6, 2013, Mr. Sturgeon requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 139-40.)  The ALJ conducted a hearing on September 23, 2014.  (Tr. 43-75.)  Mr. Sturgeon appeared in person at the hearing with Social Security disability advocate Teddi Rivera.[4]  (*Id.*, Tr. 156-57.)  The ALJ took testimony from Mr. Sturgeon (Tr. 48-68) and an impartial vocational expert ("VE"), Judith Beard.  (Tr. 68-74.)

On October 17, 2014, the ALJ issued an unfavorable decision.  (Tr. 25-37.)   In arriving at his decision, the ALJ determined that Plaintiff met the insured status requirements of the Act

---

[2] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 16) that was lodged with the Court on July 30, 2015.

[3] Protective Filing Status is achieved once an individual contacts the Social Security Administration with the positive stated intent of filing for Social Security Disability benefits.  The initial contact date is considered a claimant's application date, even if it is earlier than the date on which the Social Security Administration actually receives the completed and signed application.  *See* 20 C.F.R. §§ 404.614, 404.630, 416.325, 416.340, 416.345.

[4] Mr. Sturgeon is represented in this proceeding by Gary J. Martone.  (Tr. 174.)

through December 31, 2014,[5] and that Mr. Sturgeon has not engaged in substantial gainful activity since his alleged disability onset date.  (Tr. 30.)   The ALJ found that Mr. Sturgeon suffered from severe impairments of chronic back problems/pain and COPD with fatigue.  (*Id.*)  The ALJ also determined that Mr. Sturgeon suffered from non-severe impairments of diabetes mellitus II, hypertension, hyperlipidemia, GERD, insomnia, left elbow tendonitis, erectile dysfunction, and obstructive sleep apnea.  (*Id.*)  However, the ALJ found that these impairments, individually or in combination, do not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 32.)

Because he found that Mr. Sturgeon's impairments did not meet a Listing, the ALJ then went on to assess Mr. Sturgeon's residual functional capacity ("RFC").  The ALJ stated that

> [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined by the regulations, including lifting 20 pounds occasionally and lifting and carrying 10 pounds frequently.  He can sit, stand and walk six hours each in an eight-hour day.  He may frequently climb ramps and stairs, occasionally stoop, kneel, crouch and crawl, but may never climb ladders, ropes and scaffolds.  He must avoid more than occasional exposure to extreme cold, vibrations, irritants such as fumes, odors, dust, gases, chemicals, and poorly ventilated spaces, and hazards such as dangerous machinery, open flames and unsecured heights.

(Tr. 33.)  Based on the RFC and the testimony of the VE, the ALJ concluded that Mr. Sturgeon was capable of performing his past relevant work as a fastener sales representative and was therefore not disabled.  (Tr. 36-37.)

On March 10, 2015, the Appeals Council issued its decision denying Mr. Sturgeon's request for review and upholding the ALJ's final decision.  (Tr. 1-4.)  On April 24, 2015,

---

[5] To receive benefits, Mr. Sturgeon must show he was disabled prior to his date of last insured.  *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1347 (10th Cir. 1990).

Mr. Sturgeon timely filed a Complaint seeking judicial review of the Commissioner's final decision.  (Doc. 1.)

## II.  <u>Standard of Review</u>

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision[6] is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence.  42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record, but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner.  *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).  In other words, the Court does not reexamine the issues *de novo*.  *Sisco v. U.S. Dep't. of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).  The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118.  Substantial evidence is "more than a scintilla, but less than a preponderance."  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley, 373 F.3d at 1118, or "constitutes mere conclusion." Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992).*  The Court's examination of the record as a whole must include "anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met."  *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).  "The possibility of drawing two inconsistent conclusions from the

---

[6] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which is generally the ALJ's decision.  20 C.F.R. §§ 404.981, 416.1481.  This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision.

evidence does not prevent [the] findings from being supported by substantial evidence." *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. Fed. Aviation Admin.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).   Thus, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court would have "made a different choice had the matter been before it *de novo*." *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted). Thus, even if a reviewing court agrees with the Commissioner's ultimate decision to deny benefits, it cannot affirm that decision if the reasons for finding a claimant not disabled were arrived at using incorrect legal standards, or are not articulated with sufficient particularity. *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). "[T]he record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence." *Id.* at 1009-10.   Rather, the ALJ need only discuss the evidence supporting his decision, along with any "uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.*; *Mays v. Colvin*, 739 F.3d 569, 576 (10th Cir. 2014).

### III.   Applicable Law and Sequential Evaluation Process

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).  To qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process.  20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  At the first four steps of the evaluation process, the claimant must show that: (1) he is not engaged in "substantial gainful activity"; *and* (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) his impairment(s) meet or equal one of the Listings[7] of presumptively disabling impairments; *or* (4) he is unable to perform his "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv); *Grogan* 399 F.3d at 1261.  If the claimant can show that his impairment meets or equals a Listing at step three, the claimant is presumed disabled and the analysis stops.  If at step three, the claimant's impairment is not equivalent to a listed impairment, before moving on to step four of the analysis, the ALJ must consider all of the relevant medical and other evidence, including all of the claimant's medically determinable impairments whether "severe" or not, and determine what is the "most [the claimant] can still do" in a work setting despite his physical and mental limitations.  20 C.F.R. § 404.1545(a)(1)-(3).  This is called the claimant's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1545(a)(1) & (a)(3).  The claimant's RFC is used at step four to determine if he can perform the physical and mental demands of his past relevant work.  20 C.F.R. § 404.1520(a)(4),

---

[7] 20 C.F.R. pt. 404, subpt. P. app. 1.

404.1520(e).  If the claimant establishes that he is incapable of meeting those demands, the burden of proof then shifts to the Commissioner, at step five of the sequential evaluation process, to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity ("RFC"), age, education, and work experience.  *Id.*, *Grogan*, 399 F.3d at 1261.

Although the claimant bears the burden of proving disability in a Social Security case, because such proceedings are nonadversarial, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised."  *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006).  "This is true despite the presence of counsel."  *Henrie*, 13 F.3d at 361.  "The duty is one of inquiry and factual development," *id.*, "to fully and fairly develop the record as to material issues."  *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997).  This may include, for example, an obligation to obtain pertinent medical records or to order a consultative examination.  *Madrid*, 447 F.3d at 791-92.  The duty is triggered by "some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation."  *Hawkins*, 113 F.3d at 1167.

## IV.  Analysis

Mr. Sturgeon asserts two arguments in support of reversing and remanding his case, as follows: (1) the ALJ erred in failing to properly apply the treating physician rule to Dr. Karen Cardon's opinion; and (2) the ALJ erred in evaluating Mr. Sturgeon's credibility.  For the reasons discussed below, Mr. Sturgeon's motion will be denied.

A.    **The ALJ Properly Evaluated Treating Physician Karen Cardon's Opinion**[8]

Mr. Sturgeon first argues that ALJ Rolph failed to apply the two phases of the treating physician rule when he evaluated Dr. Karen Cardon's opinion.  (Doc. 21 at 12.)  Mr. Sturgeon specifically asserts that the ALJ failed to determine whether Dr. Cardon's opinion was entitled to controlling weight and, if not, to apply the appropriate factors to determine whether or not her opinion was entitled to deference.  (*Id*.)  Mr. Sturgeon contends that the ALJ's failure to properly evaluate Dr. Cardon's opinion was harmful because she assessed greater physical limitations than set out in the ALJ's RFC.  (*Id.* at 14.)  The Commissioner argues that the ALJ reasonably discounted Dr. Cardon's opinion as it differed significantly from her own treatment notes and the treatment she provided to Mr. Sturgeon.  (Doc. 25 at 15-16.)  As such, the Commissioner asserts that the ALJ reasonably gave Dr. Cardon's opinion only some weight and provided good reasons for doing so.  (*Id*.)  The Court agrees with the Commissioner.

1.    **Mr. Sturgeon's Relevant Medical History**[9]

On February 3, 2012, Mr. Sturgeon established care with the Albuquerque Veterans Health Administration ("VA"), and initially saw John G. Link, M.D.  (Tr. 457.)  On physical exam, Dr. Link noted, *inter alia*, that Mr. Sturgeon had "no cva tenderness, no back pain noted to palpation," and that Mr. Sturgeon had bilateral negative straight leg raising tests.  (Tr. 459.)  Dr. Link noted that Mr. Sturgeon reported exercising and stretching, but that his back pain had worsened over the last 3 months.  (Tr. 461.)  Dr. Link prescribed Motrin 800 mg., Flexeril

---

[8] Dr. Karen Cardon is an attending physician at the Albuquerque Veterans Health Administration and became Mr. Sturgeon's treating physician on August 6, 2012, and generally oversaw Mr. Sturgeon's care from that date through August 4, 2014.  *See* Section IV.A.1., *infra*.

[9] Although the Court has considered the entire record, the Court's discussion of Mr. Sturgeon's medical history is limited to Mr. Sturgeon's argument that the ALJ failed to properly evaluate Dr. Cardon's medical assessment that Mr. Sturgeon was physically limited in his ability to lift/carry, sit/stand/walk, push/pull, handle/finger, and climb, stoop, kneel, crouch or crawl.  (Tr. 729-33.)

10 mg., and Vicodin 500 mg. twice a day.  (*Id.*)  Dr. Link indicated that Mr. Sturgeon was satisfied with his current regimen of pain control and level of functioning.  (*Id.*)

On February 17, 2012, Mr. Sturgeon left a secure message for Dr. Link requesting an increase in Vicodin for uncontrolled back pain.  (Tr. 451.)

On April 24, 2012, Mr. Sturgeon reported to Dr. Link that his low back pain persisted and he wanted x-rays.  (Tr. 440-41.)  Dr. Link noted that Mr. Sturgeon reported exercising and stretching, and taking prescribed medications Motrin, Flexeril and Vicodin.  (Tr. 441.)  Dr. Link agreed to obtain x-rays and to consider an MRI.  (*Id.*)

On April 27, 2012, Mr. Sturgeon underwent an "L-Spine AP, Lateral & L-5 S-1" for ongoing low back pain and a "C-Spine AP, Lateral, Obliques" for reported neck pain.  (Tr. 304, 306.)  Both sets of x-rays demonstrated early and minor degenerative disc changes.  (*Id.*)  Dr. Link described Mr. Sturgeon's x-ray results to him as "mostly pretty normal."  (Tr. 433.)

On May 10, 2012, Mr. Sturgeon requested a physical therapy referral for his ongoing low back pain.  (Tr. 430-31.)

Mr. Sturgeon participated in back exercise classes through the VA on June 11, 2012, July 2, 2012, July 9, 2012, and July 16, 2012, with no complications.  (Tr. 418-19, 419-20, 424, 428.)

On June 14, 2012, Mr. Sturgeon left a secure message for Dr. Link requesting an increase in his Vicodin explaining that his current dosage had become less effective with time.  (Tr. 426.)

On August 6, 2012, Mr. Sturgeon established care with Dr. Cardon and reported that his main concern was lower back pain, that his pain worsened with prolonged sitting, and that he was unable to do activities in the same manner.  (Tr. 408.)  Mr. Sturgeon indicated his pain was a 4/10, but that he was able to perform his routine activities of daily living.  (Tr. 410.)  Dr. Cardon

noted that Mr. Sturgeon was under the impression his x-rays showed severe degenerative disease, which she discussed with him was not the case.  (*Id.*)  On physical exam, Dr. Cardon indicated no spinal tenderness or obvious trigger points, and no neuropathy or muscle weakness.  (*Id.*)  Dr. Cardon assessed that Mr. Sturgeon's back pain appeared to be mainly muscle spasms and possibly due to poor posture and a history of heavy lifting.  (*Id.*)  Dr. Cardon instructed Mr. Sturgeon to continue stretching, attending his stress class, and using his TENS unit.  (*Id.*)  She also prescribed oxycodone every four hours as needed.  (*Id.*)

On August 8, 2012, Mr. Sturgeon left a secure message for Dr. Cardon stating that he was extremely happy with the results of taking oxycodone.  (Tr. 406.)

On September 10, 2012, Mr. Sturgeon saw Dr. Cardon for follow up on his back pain after starting oxycodone.  (Tr. 398.)  Mr. Sturgeon reported that his pain was much improved, as was his ability to do work and hobbies.  (Tr. 398-99.)  Mr. Sturgeon stated, however, that the oxycodone wore off in 4-5 hours.  (Tr. 398.)  He reported no side effects.  (*Id.*)  Dr. Cardon increased the oxycodone to 10 mg. every six hours, and instructed Mr. Sturgeon to continue his stretching, attending stress class, and using TENS unit.  (Tr. 399.)

On September 28, 2012, Mr. Sturgeon left a message for Dr. Cardon stating that "[w]ith regard to the increase in the oxycodone, it has been doing the job quite well, and I am very satisfied with it.  No need for change."  (Tr. 390.)

On November 5, 2012, Mr. Sturgeon reported to Dr. Cardon that his lower back pain was tolerable and that he was functional on his current regimen.  (Tr. 379-80.)  Dr. Cardon instructed Mr. Sturgeon to continue oxycodone, 10 mg., every six hours, and to continue his stretching, attending stress class, and using TENS unit.  (*Id.*)

On December 10, 2012, Mr. Sturgeon told Dr. Cardon that he had ups and downs, but that his pain was generally well-controlled.  (Tr. 361.)  He reported a pain level of 5, that he was benefitting from his treatment, and that he was able to perform his routine activities of adult living.  (Tr. 363.)  Dr. Cardon instructed Mr. Sturgeon to continue oxycodone, 10 mg., every six hours, and to continue his stretching, attending stress class, and using his TENS unit.  (*Id*.)

On December 14, 2012, Mr. Sturgeon left a secure message for Dr. Cardon requesting a longer acting medication combined with his oxycodone.  (Tr. 352.)  Mr. Sturgeon explained that his current medication was only lasting three hours and then he became uncomfortable.  (Tr. 352-53.)

On December 31, 2012, Mr. Sturgeon talked by phone with LPN Charlene Angus and explained that he was in a lot of pain between his medication doses and wanted to increase his pain medication.  (Tr. 347.)

On January 29, 2013, Mr. Sturgeon saw VA staff physician John R. Steeper and complained of low back pain.   (Tr. 337-39.)   Mr. Sturgeon reported that he had been on oxycodone "for years" with poor pain control.  (Tr. 338.)  Dr. Steeper noted that x-ray findings were unremarkable and that Mr. Sturgeon did not present with any red flags for neuro deficits.  (Tr. 339.)  Dr. Steeper recommended Mr. Sturgeon convert to a long acting narcotic and started Mr. Sturgeon on morphine SR 15 mg. twice a day, with oxycodone for breakthrough pain.  (*Id*.)

On March 5, 2013, Mr. Sturgeon presented to Dr. Steeper for a follow up on his pain control.  (Tr. 332-33.)  Mr. Sturgeon reported that the morphine provided improved pain control, but wore off before 12 hours.  (*Id*.)  Dr. Steeper increased the morphine to SR 15 mg. three times a day, and decreased Mr. Sturgeon's monthly dose of oxycodone.  (*Id.*)

On March 29, 2013, Mr. Sturgeon underwent frontal and lateral radiographs of both knees for reported chronic pain.   (Tr. 301, 302, 516.)   The x-rays demonstrated no acute abnormalities or significant degenerative change.  (*Id.*)

On April 15, 2013, Mr. Sturgeon left a secure message for Dr. Steeper that he was content and doing quite well with the morphine, and using oxycodone for breakthrough pain less often.  (Tr. 514.)

On May 30, 2013, Mr. Sturgeon left a secure message for Dr. Steeper requesting an increase in his morphine.  (Tr. 509.)  Mr. Sturgeon explained that he was exercising regularly and busy with school, but that he was having more pain during the day.  (*Id.*)  Dr. Steeper agreed to increase his morphine to four times a day, and decreased Mr. Sturgeon's monthly dose of oxycodone.  (Tr. 508.)

On July 2, 2013, Mr. Sturgeon reported to his mental health care provider, Psychiatrist Gladys A. Richardson, M.D., that his pain was not adequately controlled and requested to see Dr. Cardon.   (Tr. 499-503.)   Dr. Richardson referred Mr. Sturgeon for pain management.  (Tr. 503.)

On July 18, 2013, Mr. Sturgeon saw resident Paul Romo, M.D., and complained that his pain meds were not covering his pain, and that he had increased his oxycodone to four times a day to help with pain coverage.  (Tr. 488.)  Mr. Sturgeon also reported that he used massage, a TENS unit, hot/cold compresses, rest, and stretching techniques to help with his pain.  (*Id.*)  Dr. Romo gave Mr. Sturgeon recommendations for better pain control, and instructed him to increase oxycodone 10mg to four times a day.  (Tr. 491.)

On August 1, 2013, Mr. Sturgeon told Dr. Romo that his lower back pain was at a 4/10, and that he was sleeping well and waking rested.   (Tr. 720-21.)  Mr. Sturgeon reported that the

increased oxycodone did not render him overly sedated or confused during the day. (Tr. 721.) Dr. Romo noted that Mr. Sturgeon's back pain was stable and controlled with current regimen, and instructed Mr. Sturgeon to continue the increased oxycodone. (Tr. 722.)

On August 29, 2013, Mr. Sturgeon reported to Dr. Romo that he was applying for jobs, his mood was "good," he was sleeping eight hours a night and waking rested. (Tr. 708.) Mr. Sturgeon stated that his back pain was a 4/10 with medication and sometimes worse with prolonged upright sitting. (*Id.*) Mr. Sturgeon told Dr. Romo he only wore his back brace when working on musical instruments. (Tr. 708.) Mr. Sturgeon stated he had no noticeable side effects from his medications, including no oversedation, euphoria, or confusion. (*Id.*) Dr. Romo assessed that Mr. Sturgeon's back pain was stable and controlled, and instructed him to continue medication regimen. (Tr. 710.)

On November 19, 2013, Mr. Sturgeon saw resident Kristen Barrett, M.D., and stated he experienced a slip and fall approximately one week prior which exacerbated his back pain. (Tr. 683.) Mr. Sturgeon also stated that his oxycodone was not lasting a full six hours and was not bringing the pain down to an acceptable level. (*Id.*) Mr. Sturgeon complained that he was less able to do things he enjoyed, like riding his motorcycle. (*Id.*) Mr. Sturgeon's physical exam was normal and the record noted there were no "red flag" symptoms. (Tr. 685.) Dr. Barrett assessed Mr. Sturgeon's increased pain was likely due to myofascial pain syndrome with acute muscle strain following his fall. (Tr. 685.) She decreased Mr. Sturgeon's morphine dose to three times a day, and increased his frequency of oxycodone to every four hours. (*Id.*) Dr. Cardon prepared an addendum to Dr. Barrett's notes and agreed that Mr. Sturgeon met the criteria for myofascial pain syndrome, but had also had a recent slip and fall with likely strain. (Tr. 686.)

Dr. Cardon noted that Mr. Sturgeon was using a TENS unit, stretching, and trying to remain active. (*Id.*)

On January 30, 2014, Mr. Sturgeon reported to Dr. Romo that his back seemed to be getting better. (Tr. 634.) Mr. Sturgeon stated that his back pain was 3-4/10 with medication, and improved with massage, stretching, TENS unit, and worsened when extending his back, or standing or sitting for prolonged periods of time. (*Id.*) Dr. Romo assessed that Mr. Sturgeon's back pain was stable and instructed him to continue medication regimen. (Tr. 636.)

On February 5, 2014, Mr. Sturgeon followed up with Christine S. Johnson, M.D., for hypertension. (Tr. 623-24.) At that visit, Dr. Johnson noted that Mr. Sturgeon's musculoskeletal exam revealed no myalgia, no arthralgia, no weakness and no pain. (Tr. 624.)

On March 19, 2014, Mr. Sturgeon reported to medical student Edward Romero that his lower back pain was well managed on his medications, although he had concern that the morphine was causing sudden onset nausea. (Tr. 590.) Mr. Sturgeon also reported using his TENS unit, stretching, and trying to remain active as part of his pain control regimen. (*Id.*) Mr. Sturgeon stated he was able to be more active and complete his activities of adult living when his pain was controlled. (Tr. 591.) Mr. Romero assessed that Mr. Sturgeon's back pain was improved with medications, activity, analgesic cream, and ibuprofen. (*Id.*) Mr. Romero noted that the VA was willing to transition Mr. Sturgeon from morphine to low-dose methadone, and Mr. Sturgeon agreed to research. (*Id.*) Dr. Cardon prepared an addendum noting her agreement with Mr. Romero's notes. (Tr. 592.)

On June 17, 2014, Mr. Sturgeon told LPN Catherine Asmus he was taking more of his oxycodone because the morphine was making him sick. (Tr. 776.) He complained that his back and leg pain felt like "a migraine." (*Id.*) LPN Asmus noted that Dr. Cardon came to speak with

Mr. Sturgeon and was going to put in an order for x-rays. (*Id.*) Thereafter, on June 25, 2014, Mr. Sturgeon underwent an "L-Spine AP, Lateral & L-5 S-1" for chronic back pain. (Tr. 737.) The x-rays demonstrated mild osteoarthritis of the lumbar spine. (*Id.*)

On July 7, 2014, Mr. Sturgeon saw CNP Clare B. Romero and requested trigger point injections. (Tr. 879.) He described his back spasm pain as stabbing and occasionally radiating down his legs. (*Id.*) Mr. Sturgeon explained that he stopped taking morphine due to nausea, had decided not to take methadone, and that oxycodone was the most effective medication at bringing down his pain. (*Id.*) Mr. Sturgeon stated that he hoped the trigger point injections combined with oxycodone would fully manage his pain. (*Id.*) CNP Romero administered trigger point injections. (*Id.*)

On July 14, 2014, Mr. Sturgeon told Dr. Cardon that he was very happy with the trigger point injections. (Tr. 874). Dr. Cardon administered repeat trigger point injections. (*Id.*) On August 4, 2014, Mr. Sturgeon reported that oxycodone was controlling his pain well. (Tr. 853.) CNP Romero administered repeat trigger point injections. (*Id.*)

## 2.     Medical Source Statement of Ability To Do Work-Related Activities (Physical)

On July 7, 2014, Dr. Cardon prepared a Medical Source Statement of Ability To Do Work-Related Activities (Physical) on Mr. Sturgeon's behalf. (Tr. 729-34.) Dr. Cardon assessed that Mr. Sturgeon (1) could occasionally lift and/or carry 10 lbs.; (2) could sit/stand at one time for 15-20 minutes, walk for 5 minutes at one time, sit for 2 hours in an 8-hr. workday, stand for 6 hours in an 8-hr. workday, and walk for 3 hours in an 8-hr. workday; (3) could use his hands to frequently reach, occasionally handle/finger, and never feel/push/pull; (4) could use his feet to operate foot controls continuously; and (5) could frequently balance, occasionally climb stairs, stoop, kneel, crouch and crawl, and never climb ladders or scaffolds. (Tr. 732) Dr. Cardon

additionally assessed that Mr. Sturgeon could occasionally operate a motor vehicle and tolerate vibrations, but could never be exposed to unprotected heights, moving mechanical parts, humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold or extreme heat. (Tr. 733)  Dr. Cardon assessed that Mr. Sturgeon (1) could perform activities like shopping; (2) could travel without a companion for assistance; (3) could ambulate without assistance; (4) could climb a few steps at a reasonable pace with the use of a single hand rail; (5) could prepare simple meals and feed himself; (6) could care for his personal hygiene; and (7) could sort, handle and use paper/files.  (Tr. 734.)  Finally, Dr. Cardon assessed that Mr. Sturgeon could not walk a block at a reasonable pace on rough or uneven surfaces or use standard public transportation.  (*Id*.)

### 3.      The ALJ's Evaluation of Dr. Cardon's Opinion

According to what has become known as the treating physician rule, an ALJ will generally give more weight to medical opinions from treating sources than those from non-treating sources.  *Langley*, 373 F.3d at 1119 (citing 20 C.F.R. § 404.1527(d)(2)).  An ALJ is required to conduct a two-part inquiry with regard to treating physicians.  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).  First, the ALJ must decide whether a treating doctor's opinion commands controlling weight.  638 F.3d at 1330.  A treating doctor's opinion must be accorded controlling weight "if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record."  *Id.* (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (applying SSR 96-2p, 1996 WL 374188, at *2).[10]  If a treating doctor's opinion does not meet this standard, the opinion is

---

[10] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes.  *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35*; see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

still entitled to deference to some extent as determined under the second step of the process. *Id.* In this second step, the ALJ must determine the weight to accord the treating physician by analyzing the treating doctor's opinion against the several factors provided in 20 C.F.R. § 404.1527(c).[11]  The ALJ is not required to "apply expressly" every relevant factor. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). "Under the regulations, the agency rulings, and our case law, an ALJ must give good reasons . . . for the weight assigned to a treating physician's opinion," that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." *Langley*, 373 F.3d at 1119 (quoting *Watkins*, 350 F.3d at 1300). Finally, if the ALJ rejects the opinion completely, he must then give "'specific, legitimate reasons'" for doing so. *Watkins*, 350 F.3d at 1301 (citing *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996) (quoting *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987)).

The ALJ's discussion regarding Dr. Cardon's opinion was as follows:

---

[11] These factors include:

(1) Examining relationship. . . . (2) Treatment relationship. . . . (i) Length of the treatment relationship and the frequency of examination. . . . (ii) Nature and extent of the treatment relationship. . . . (3) Supportability. The more a medical source presents evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [the ALJ] will give that opinion. The better an explanation a source provides for an opinion, the more weight [the ALJ] will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with [the claimant], the weight [the ALJ] will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. [The ALJ] will evaluate the degree to which these opinions consider all of the pertinent evidence in [a claimant's] claim, including opinions of treating and other examining sources. (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion. (5) Specialization. [The ALJ will] generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. (6) Other factors. When [the ALJ] consider[s] how much weight to give to a medical opinion, [the ALJ] will also consider any factors [brought] to [his] attention or of which [he is] aware, which tend to support or contradict the opinion. For example, the amount of understanding of [SSA's] disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in [a claimant's] case record are relevant factors that [the ALJ] will consider in deciding the weight to give a medical opinion.

20 C.F.R. § 404.1527(c).

Karen Cardon, M.D., the claimant's treating physician submitted a Medical Source Statement dated July 7, 2014.  She opined that the claimant is limited to sedentary work, has manipulative limitations in reaching, handling, and fingering and is able to sit for two hours in an eight-hour day, stand for six hours in an eight-hour day and walk for three hours in an eight-hour day.

Social Security Regulations provide that the opinion of a treating physician is entitled to significant evidentiary weight if it is well supported by objective clinical findings and not contrary to the opinions of the other treating and examining physicians in the record.  However, Dr. Cardon has submitted no treatment records or progress notes to support the limitations noted in the Medical Source Statement.  As noted above, medical records from Dr. Cardon all indicate that the claimant's medical conditions are well controlled with medications.  Further, treatment records from Dr. Cardon make no mention of the sitting/standing/walking limitations noted in the Medical Source Statement.  I have thoroughly reviewed the medical evidence of record and can find no MRI studies, which is odd considering the claimants reports of continued severe back pain and the lack of objective findings on x-rays.  It would be reasonable to assume that had Dr. Cardon suspected a significant back impairment, with the extreme limitations noted in the Medical Source Statement, she would have ordered MRI studies.  I also note that the claimant's overall daily functioning involves activities greater than the lifting and manipulative restrictions noted by Dr. Cardon (moving household goods, lifting/making musical instruments, attending classes where he uses pens and computers and driving motorcycles, which involves significant bilateral hand use/dexterity/gripping).  Thus, while I am considering Dr. Cardon's opinion, I find it only entitled to some weight in my determination (SSR 96-2p).

(Tr. 35.)

The ALJ satisfied both parts of the two-part inquiry *Krauser* requires.  638 F.3d at 1330.  As to the first part, although the ALJ did not explicitly state that Dr. Cardon's opinion was not entitled to controlling weight, his finding was implicit in his decision.  *See Armijo v. Astrue*, 385 F. App'x 789, 795 (10th Cir. 2010) (finding that ALJ's implicit determination that treating physician's opinion was not entitled to controlling weight was supported by substantial evidence); *see also Tarpley v. Colvin*, 601 F. App'x 641, 643-44 (10th Cir. 2015) (finding ALJ's failure to explicitly state whether treating physician was entitled to controlling weight was harmless where ALJ adequately explained weight given).  As to the second part, the ALJ

determined that Dr. Cardon's opinion was entitled to "some weight," and provided specific and legitimate reasons for that weight. The ALJ explained that Dr. Cardon had submitted no treatment records or progress notes to support the limitations she noted in her Medical Source Statement. (Tr. 35.) The ALJ further explained that Dr. Cardon's records indicated that Mr. Sturgeon's medical conditions were well controlled with medications, and that Dr. Cardon never mentioned any sitting/standing/walking limitations in her treatment notes. (*Id.*) The ALJ also noted that there were no objective findings on x-rays to support Dr. Cardon's limitations, and that Dr. Cardon had not pursued MRI studies. (*Id.*) Finally, the ALJ explained that Mr. Sturgeon's overall daily functioning involved activities greater than the lifting and manipulative restrictions Dr. Cardon assessed. (*Id.*) The Court also finds that the ALJ 's reasons are supported by substantial evidence.

### a.    Mr. Sturgeon's Pain Management

The medical record evidence supports that Mr. Sturgeon was treated at the VA by several healthcare providers, including Dr. Cardon, from February 3, 2012 until August 4, 2014, for, *inter alia*, back pain. *See* Section IV.A.1., *supra*. The ALJ explained that Dr. Cardon's records did not support her assessed limitations because they indicated that Ms. Sturgeon's medical conditions were well controlled with medications, and that Dr. Cardon never imposed any sitting, standing, or walking limitations. (Tr. 35.) *See Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007) (medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence). The record supports these findings. Although Mr. Sturgeon consistently complained of back pain, and his healthcare providers adjusted his medications in response to his complaints of increased pain from time to time, Mr. Sturgeon nonetheless routinely reported that he was satisfied with his pain control regimen and his level of functioning, and was able to

perform his routine activities of daily living.   (Tr. 332-33, 361-63, 379-80, 390, 398-99, 406, 410, 461, 514, 590-91, 634-36, 710, 722, 853, 874.)   Further, the ALJ correctly observed that Dr. Cardon never limited Mr. Sturgeon's sitting, standing or walking as part of his pain control regimen.   Mr. Sturgeon argues that documenting specific limitations regarding sitting, standing, or walking may not have been necessary for his medical treatment and therefore not noted in the records.   (Doc. 21 at 13.)   However, Mr. Sturgeon's healthcare providers repeatedly noted their instructions to Mr. Sturgeon for managing his back pain, aside from medication, that included stretching, using his TENS unit, massage, and attending back exercise classes.   (Tr. 363, 380, 399, 410, 461.)   Thus, there is no basis to support that had Dr. Cardon, or any of Mr. Sturgeon's healthcare providers, deemed limitations were necessary for managing Mr. Sturgeon's back pain they would not have noted them.   Further, on the three occasions when Mr. Sturgeon specifically reported that prolonged sitting and/or standing worsened his pain, no limitations were noted. (Tr. 408-10, 634-36, 708-10.)   Instead, Mr. Sturgeon was instructed to maintain his pain control regimen.   (*Id.*)

### b.        Mr. Sturgeon's Radiologic Findings

Next, the ALJ explained in his determination that the record lacked objective findings on x-rays and there were no MRI studies.   (Tr. 35.)   *See* 20 C.F.R. §§ 404.1527(c)(3) and 416.927(c)(3) (instructing that more weight will be given to a medical source opinion that is supported by medical signs and laboratory findings).   The record supports the ALJ's findings. Radiologic studies evidenced only minor degenerative changes and mild osteoarthritis in Mr. Sturgeon's lumbar spine.   (Tr. 433, 737.)   As for the lack of MRI studies, Mr. Sturgeon argues that the ALJ improperly substituted his lay opinion for a medical opinion when the ALJ stated it was "reasonable to assume that had Dr. Cardon suspected a significant back impairment,

with the extreme limitations noted in the Medical Source Statement, she would have ordered MRI studies." (Doc. 21 at 22.) Mr. Sturgeon cites *Sisco v. U.S. Dept. of Health and Human Servs.*, 10 F.3d 739, 744 (10th Cir. 1993), a case where the court found an ALJ had overstepped his bounds and substituted his lay opinion for a medical opinion when he contradicted "Congress, the Mayo Clinic, Plaintiff's doctor, and the entire medical community" by stating that chronic fatigue syndrome might not be a legitimate disease until it could be diagnosed in a laboratory setting. *Id.* That is not the case here. Here, the ALJ did not dispute the existence of Mr. Sturgeon's chronic back problems, or that it could be expected to cause Mr. Sturgeon's alleged pain. (Tr. 30, 34.) Instead, the ALJ explained that the limitations Dr. Cardon assessed were not supported by the objective radiologic studies present in the record and because, *inter alia*, there was no indication that Mr. Sturgeon's presentation or symptoms prompted Dr. Cardon to pursue additional diagnostic studies. Mr. Sturgeon's reliance on *Sisco* is misplaced.[12]

### c.    Mr. Sturgeon's Overall Daily Functioning

Finally, the ALJ explained that Mr. Sturgeon's overall daily functioning involved activities greater than the lifting and manipulative restrictions noted by Dr. Cardon. (Tr. 35.) The ALJ specifically pointed to Mr. Sturgeon's "moving household goods, lifting/making musical instruments, attending classes where he uses pens and computers and driving motorcycles" during the relevant period of time. (*Id*.) Mr. Sturgeon argues that the ALJ's list of daily activities to refute Dr. Cardon's limitations regarding lifting and "bilateral hand use/dexterity/gripping" is not supported by substantial evidence. The Court disagrees. The record supports that on April 5, 2014, Mr. Sturgeon presented to the VA Emergency Room

---

[12] Mr. Sturgeon also argues that radiologic or MRI studies would not have demonstrated his myofascial pain. (Doc. 21 at 13.) However, as previously stated, the ALJ did not dispute the existence of Mr. Sturgeon's chronic back problem, whatever the cause. The issue is whether the limitations Dr. Cardon assessed were well-supported by medically acceptable clinical or laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record.

seeking additional pain medication and explained to the triage nurse that he had run out of medication because "he move[d] from house to house and move[d] everything himself and exarcerbate[d] the pain."  (Tr. 574-75.)  When asked at the hearing about moving furniture and household goods, Mr. Sturgeon testified that he "took a couple of guitars and mandolins" and did not move "loads and loads of things."  (Tr. 67.)  When asked a second time, Mr. Sturgeon testified "[i]f we're talking washers and dryers, no things like that."  (*Id.*)  The record supports that Mr. Sturgeon reported during a mental health consult on June 9, 2014, that his hobby was building musical instruments, and reported to his nutritionist on July 1, 2014, that he was busy building instruments.  (Tr. 750, 760.)  When asked about building and/or playing musical instruments at the hearing, Mr. Sturgeon testified that he spent time building small musical instruments that he also played instruments, but not "as much [as he used to] because his hands cramp after a little while."[13]  (Tr. 65.)  The record supports that Mr. Sturgeon attended college classes from August 2012 through July 2013, and stopped going not because he was unable to meet the physical demands of attending school, but because he felt overwhelmed and anxious thinking about his future.  (Tr. 182, 494.) When asked about attending college courses at the hearing, Mr. Sturgeon testified that he stopped attending school due to his anxiety.  (Tr. 61-62.)  Finally, the record supports that on April 2, 2013, Mr. Sturgeon presented for a mental status exam in his motorcycle riding gear of leather chaps and a bandana, and on May 9, 2014, Mr. Sturgeon reported that he had auditioned for a biker role in a Hollywood movie.  (Tr. 322, 806.)  When asked about driving a motorcycle at the hearing, Mr. Sturgeon testified he drove his

---

[13] The Court's review of the record failed to uncover any medical record where Mr. Sturgeon complained of hand pain.

motorcycle, but sold it "last summer"[14] because he couldn't ride it more than a half a mile without being in a lot of pain.  (Tr. 63.)

Although Mr. Sturgeon asserts his testimony could support a contrary finding, the ALJ's findings are nonetheless supported by substantial evidence.  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence."  *Lax*, 489 F.3d at 1084 (citation omitted).  Further, as discussed below, the ALJ found Mr. Sturgeon's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible and linked his findings to substantial evidence.  (Tr. 34.)   Thus, the Court will not overturn the ALJ's findings regarding Mr. Sturgeon's credibility.   *See Oldham*, 509 F.3d at 1257 (citing *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (credibility determinations are peculiarly the province of the ALJ and will not be overturned if supported by substantial evidence)).

For the foregoing reasons, the Court finds the ALJ applied the correct legal standard in evaluating Dr. Cardon's opinion, and the ALJ's reasons for according her opinion only some weight are supported by substantial evidence.

## 2.    The Credibility Finding is Supported by Substantial Evidence

Mr. Sturgeon next argues that the ALJ's credibility finding is not supported by the record because he mischaracterized Mr. Sturgeon's daily activities.  (Doc. 21 at 15-21.)  Mr. Sturgeon argues that the ALJ cited to generalities, but that the "specific facts behind the generalities" "paint a very different picture" of Mr. Sturgeon's daily activities than the one painted by the ALJ.   (*Id*. at 15.)   The Commissioner contends that the ALJ reasonably found that Mr. Sturgeon's claims were not entirely credible because, among other things, his daily activities were inconsistent with his claims of disability.  (Doc. 25 at 9-14.)  The Commissioner further

---

[14] The hearing was held on September 23, 2014.  (Tr. 43.)

contends that the ALJ noted activities that Mr. Sturgeon reported either through testimony or to healthcare providers throughout his claimed period of disability.  (*Id*. at 10.)  The Commissioner asserts that Mr. Sturgeon's contradictory claims do not erase the substantial evidence in the record to support the ALJ's findings.  (*Id.* at 12.)

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence."  *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (internal quotation omitted)).  Nevertheless, an ALJ's credibility finding "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.; see also* SSR 16-3p, 2016 WL 1119029, at *9 ("it is not sufficient for our adjudicators to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'").

In assessing a claimant's complaints of disabling pain, an ALJ must consider both objective and subjective evidence.  *See Kepler*, 68 F.3d at 390 (claimant is entitled to have his nonmedical objective and subjective testimony of pain evaluated and weighed alongside the medical evidence).  Because they are subjective, a claimant's statements regarding his pain "can be evaluated only on the basis of credibility."  *Thompson*, 987 F.2d at 1488-89.  As such, "[subjective] statements regarding the intensity and persistence of the pain must be consistent with the medical findings and signs."  *Gossett v. Bowen*, 862 F.2d 802, 806 (10th Cir. 1988).  An ALJ should consider, *inter alia*, an "individual's daily activities;" the "location, duration, frequency, and intensity of the individual's pain;" the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;"

24

and "any measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board)." *Hamlin*, 365 F.3d at 1220 (quoting SSR 96-7p, 1996 WL 374186 at *3); *see also Wilson*, 602 F.3d at 1145 (listing other factors such as the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the motivation of and relationship between the claimant and other witnesses, and the consistency of compatibility of nonmedical testimony with objective medical evidence). Tenth Circuit precedent "does not require a formalistic factor-by-factor recitation of the evidence . . . [s]o long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility." *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009) (quoting *Qualls v. Apfel*, 206 F.d 1368, 1372 (10th Cir. 2000)).

Here, the ALJ found that Mr. Sturgeon's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]" (Tr. 34.) In making his credibility finding, the ALJ articulated adequate reasons stating that

> I also note some inconsistencies in the record that leads me to question the credibility of the claimant's allegations. While the claimant alleges severe disabling impairments, he performs a wide range of daily activities inconsistent with those of a severely disabled individual such as attending college classes, exercising regularly, riding motorcycles, moving furniture, taking weekend getaways, and visiting casinos. (Exhibits 3F/22, 52, 56; 4F/22, 41, 44, 51; 11F/8; 13F/16, 26, 32, 52.)
>
> In addition, there is concern expressed in the evidence of possible drug seeking behavior. Medical records document that around July 31, 2014, the claimant reported that he accidentally lost his oxycodone in the garbage disposal and requested early refills on his prescription (Exhibits 15F/11-12 and 11F/121).
>
> Further, the claimant testified that he very actively looked for work since his alleged onset date but was simply never hired. He testified that he applied for numerous positions, including jobs at Home Depot and Lowe's (where he testified

he had applied "12 times").  This suggests that he believes he is able to work, and able to stand and walk and lift at the level commensurate with a hardware store position (Exhibit 11F/137, 154 and testimony).

The claimant alleges a disability onset date of August 1, 2009, but did not file his first claim until December 28, 2011, over two years later.[15]  The alleged onset date of August 1, 2009 is not supported as there is absolutely no medical evidence prior to February 24, 2012.

The claimant testified that he quit working on April 30, 2009, but indicates an alleged onset date of August 1, 2009, which suggests that he stopped work for reasons other than his medical condition.  On July 18, 2013, the claimant reported that he had been sober for four years since approximately July 2009.  It is interesting that his alleged onset date is more closely related to the date of his sobriety than to a date documenting an actual worsening in his medical condition.

Based on the medical and non-medical evidence and the reasons noted above, I find that the claimant's testimony and statements regarding [] his medical conditions and functional restrictions are not entirely credible.

(Tr. 36.)

The ALJ's findings are closely and affirmatively linked to substantial evidence.  The record supports that Mr. Sturgeon actively sought work during the relevant period of time.  (Tr. 63-64, 490, 704, 708, 806.)  *See* 16-3p, 2016 WL 1119029, *6 (an ALJ may consider a claimant's efforts to work in assessing credibility).  The record supports there are no medical records prior to February 3, 2012, to support Mr. Sturgeon's alleged onset date of August 1, 2009.  The record supports that Mr. Sturgeon sought additional pain medication explaining he accidentally spilled his pain medication in the garbage disposal, overused medication, and requested early refills of pain medication due to overuse.  (Tr. 488, 574-75, 683, 688, 857-58.)  *See Poppa*, 569 F.3d at 1172 (finding claimant's credibility about pain and limitations was compromised by drug-seeking behavior).

---

[15] Mr. Sturgeon testified that he initially filed a disability claim on December 28, 2011, that was denied.  (Tr. 59-60, 78, 89.)  He then refiled his claims at issue here on March 12, 2013.  (Tr. 176-85, 186-87, 205.)

To the extent Mr. Sturgeon disputes the ALJ's credibility finding, he argues that the ALJ took liberty with his daily activities and that a closer examination of Mr. Sturgeon's daily activities paint a different picture.  (Doc. 21 at 15-21.)  For example, Mr. Sturgeon asserts (1) his school experience was unsuccessful; (2) that even though he exercised regularly, the record does not provide specific information about the quality and quantity of his exercise and that sometimes exercising hurt him more than it helped him; (3) that even with exercise, he still required narcotics to manage his pain; (4) that even though he rode his motorcycle up until 8-10 months before the hearing, he had to give it up because it became too painful for him to ride; (5) that he moved guitars and mandolins from one household to another, but did not move loads and loads things; (6) that he had no recollection of ever reporting he took weekend getaways; (7) that his visits to the casino were for $2.00 hamburger specials and not to gamble; and (8) that he continually sought treatment and followed his doctor's recommendations.  (*Id.*)

The possibility of drawing two inconsistent conclusions from the evidence does not prevent the ALJ's finding from being supported by substantial evidence, and having examined the entire record including every piece of evidence that undercuts or detracts from the Commissioner's findings, the Court simply cannot conclude that the ALJ's clear and specific findings are not supported by substantial evidence.  *See Lax*, 489 F.3d at 1084.  The record reflects that Mr. Sturgeon attended college classes from August 2012 through July 2013, a period of time during which he alleged severe disability. (Tr. 182, 494.)   Mr. Sturgeon routinely reported to VA healthcare providers that he exercised and stretched as part of his pain control regimen and that doing so improved his pain.  (Tr. 410, 441, 461, 488, 509, 590, 634, 686, 708.) Further, Mr. Sturgeon participated in back exercise classes, and did so without any complications.  (Tr. 419, 420, 428.)  Mr. Sturgeon consistently sought care for his back pain and

required narcotics to manage his pain; however, he complied with his doctor's recommendations and routinely reported that his pain was generally well-controlled with narcotics, that he did not have disabling side effects,[16] that he was satisfied with his pain control regimen and his level of functioning, and that he was able to perform his activities of daily living while on the medications.  (Tr. 332-33, 361-63, 379-80, 390, 398-99, 406, 410, 461, 514, 590-91, 634-36, 710, 722, 853, 874.)  Mr. Sturgeon was able to ride his motorcycle for five years after his alleged onset date of disability until he sold it the summer before the hearing.  (Tr. 62-63.)  Mr. Sturgeon reported that he "move[d] from house to house and move[d] everything himself."  (Tr. 574-75.) Mr. Sturgeon reported to his mental health care provider that he and his wife enjoyed weekend getaways.  (Tr. 760.)  Mr. Sturgeon reported to his mental health care provider that he and his wife enjoyed going to the casino.  (*Id.*)

The Court "may not displace the agency's choice between two fairly conflicting views," even if it might have made a different determination had the matter been before it *de novo*. *Oldham*, 509 F.3d at 1257-58; *see also Hackett v. Barnhart*, 393 F.3d 1168, 1173 (10th Cir. 2005) (declining invitation to impermissibly reweigh evidence and substitute judgment for that of the Commissioner).  After examining the record as a whole, the Court is persuaded that the ALJ's credibility finding is closely and affirmatively linked to substantial evidence and the Court will not disturb the Commissioner's final decision.

---

[16] Mr. Sturgeon reported nausea and vomiting while taking morphine, and this medication was discontinued as a result.  (Tr. 590, 776, 879.)

## V. <u>Conclusion</u>

For the reasons stated above, Mr. Sturgeon's Motion to Reverse or Remand for Rehearing is **DENIED.**

_____
**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**